NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0828n.06

No. 09-5599

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Dec 12, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| JOEY MEADOWS, | ) | |
| | ) | ON APPEAL FROM THE |
| Petitioner-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF KENTUCKY |
| | ) | |
| NANCY DOOM, Warden, | ) | **O P I N I O N** |
| | ) | |
| Respondent-Appellee. | ) | |

BEFORE: NORRIS, SUTTON, and GRIFFIN, Circuit Judges.

**ALAN E. NORRIS, Circuit Judge.** Joey Meadows appeals from the denial of his petition

for a writ of habeas corpus, 28 U.S.C. § 2254. A Kentucky jury found him guilty of first-degree

sexual abuse, first-degree sodomy, and unlawful imprisonment. His convictions were affirmed on

direct appeal, *Meadows v. Commonwealth,* 178 S.W.3d 527 (Ky. App. 2005); the Kentucky

Supreme Court denied discretionary review. Petitioner then filed a motion for post-conviction relief

pursuant to Kentucky Rule of Criminal Procedure 11.42. The trial court denied the motion and the

Court of Appeals affirmed that decision. *Meadows v. Commonwealth*, No. 2007-CA-000155-MR,

2008 WL 466115 (Ky. App. Feb. 22, 2008).

Thereafter, petitioner, proceeding pro se, sought a writ of habeas corpus. The petition alleged

that the trial court erred by failing to give a requested instruction on fourth-degree assault; by

allowing the expert testimony of Dr. Brad Smock, who examined bite marks on petitioner's penis

shortly after the alleged assault and later testified that a "tremendous amount of pressure caused the

injury"; and by admitting the testimony of Dr. Russell Compton, the emergency room physician who treated the victim and testified that her injuries were consistent with her account of the sexual assault. Finally, the petition asserted that trial counsel provided constitutionally ineffective assistance.

A magistrate judge recommended that the petition, as well as a certificate of appealability ("COA"), be denied; the district court adopted that recommendation. Petitioner then filed a motion with this court seeking a COA on two issues: Dr. Compton's testimony and ineffective assistance of trial counsel. This court issued an order granting the motion.[1] On appeal, petitioner withdraws his contention that the admission of Dr. Compton's testimony justifies the issuance of the writ. Instead, he asks us to consider it in the context of his ineffective assistance of trial counsel claim. In short, the only issue before us is whether trial counsel's performance was constitutionally deficient.

**I.**

Given the presumption of correctness that attaches to factual findings made by state courts in habeas corpus proceedings filed after the enactment of the Antiterrorism and Effective Death

---

[1]Petitioner's brief addresses all four issues advanced in his petition rather than the two issues certified for appeal. While this court has stated that "[a]ppellate review of a petitioner's [habeas petition] is limited to those issues specified in the certificate of appealability," *Dunham v. United States*, 486 F.3d 931, 934 (6th Cir. 2007), we have elsewhere recognized our inherent authority to reach constitutional issues not certified. *Humphreys v. United States*, 238 F. App'x 134, 139 (6th Cir. 2007) (citing cases); *see also United States v. Shipp*, 589 F.3d 1084, 1087 (10th Cir. 2009) ("circuit courts . . . have recognized that they possess the authority to expand the COA to cover uncertified, underlying constitutional claims"). Because neither the absence of the fourth-degree assault instruction nor the testimony of Dr. Smock implicate constitutional concerns, we decline to address those issues in this opinion.

Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(e)(1), we begin with the factual recitation

provided by the Kentucky Court of Appeals on direct appeal:

> After spending some time with Jennifer and Corey McDonald and Meadows in the McDonalds's home, T.H. [the victim] decided to spend the night there. She had come to the McDonalds' home with Meadows, who is also Jennifer's brother, after meeting him in a bar a few hours earlier. Meadows also was staying with the McDonalds. T.H. borrowed pajamas from Jennifer and went to sleep alone in the bedroom to which Jennifer had taken her.
>
> At this point, the accounts of T.H. and Meadows, both of whom testified at trial, diverge. According to T.H., she did not know that the bedroom Jennifer escorted her to was also the same bedroom where Meadows planned to sleep. She testified that she woke up to find that Meadows had removed her pajama bottoms and was on top of her. He was penetrating her vagina with his penis and touching her breast. She resisted, struggling and kicking. He then switched to performing oral sex on her. After more resistance by T.H., Meadows pinned her arms, grabbed her chin, and forced his penis into her mouth. Later, he again attempted sexual intercourse.
>
> T.H. asserted that Meadows forced all of these sexual acts upon her. He pinned her down and physically restrained her. She struggled and kicked and bit Meadows at least once. Meadows repeatedly hit her in the head, choked her, and held or dragged her by her hair. He threatened to rape her anally if she were not cooperative. He once held a pillow over her head and, on multiple occasions, threatened to kill her by breaking her neck or strangling her if she awakened anyone. He added impact to these death threats by telling her that he knew how to kill people because he was trained as a Marine. T.H. was finally able to escape when he fell asleep.
>
> Meadows testified that he and T.H. never discussed where he was to sleep because it was understood that they would sleep together. Moreover, he said that she should have known that it was his bedroom since it was a three-bedroom house and the McDonalds and their baby occupied the other two bedrooms. He stated that when he went to bed, he and T.H. engaged in consensual foreplay, which included him penetrating her vagina with his finger. Then, of her own initiative, T.H. began performing fellatio on him. In the process, she accidentally injured his penis with her teeth, causing it to bleed, which made her laugh. Meadows went to the bathroom to check out the injury. The injury and T.H.'s laughter caused Meadows to lose desire for further sexual contact. At that point, he and T.H. just went to sleep. He testified that all of the sexual contact was consensual. He denied ever engaging in sexual

intercourse or cunnilingus with T.H. He also denied that he ever struck T.H., threatened her, or prevented her from leaving.

*Meadows*, 178 S.W.3d at 531.

After the jury returned its verdict, the trial court sentenced petitioner to fifteen years of incarceration.

**II.**

We review the legal conclusions underlying a district court's denial of a petition for writ of habeas corpus de novo. *Tolliver v. Sheets*, 594 F.3d 900, 915 (6th Cir. 2010). Under AEDPA, a writ may not be granted unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. 28 U.S.C. § 2254(d)(1)-(2). Factual determinations made by the state courts are presumed to be correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Petitioner faults his trial counsel's performance in a number of respects. First, counsel should have retained an expert to challenge Dr. Smock's testimony regarding the "amount of pressure necessary to cause the injury to Meadows." Second, counsel should have gathered statements from the school personnel who talked to the victim when she sought help after leaving the scene of the attack. According to a report submitted by an investigator hired by defense counsel, Sharon Davis was at an elementary school near the McDonald home when the victim walked in. Davis told the investigator the she "did not see any visible bruising" or marks on the victim's face

or neck. She also told the investigator that the victim was reluctant to call the police. Petitioner

contends that counsel should have developed this evidence. Had he done so, he might have been

able to counter Dr. Compton's testimony that the bruising was consistent with the victim's story by

developing the theory that it was "likely" that the victim, assisted by a cousin, inflicted bruising on

herself.

Petitioner also faults counsel for not interviewing employees of the Meijer's store where he

and the victim had stopped on the way to his sister's house. While there the couple could be seen

touching and kissing, which, in petitioner's view, would support the consensual nature of the

subsequent sexual activity.

Finally, petitioner takes issue with counsel's cross-examination of Dr. Compton. The

Kentucky Court of Appeals rejected petitioner's challenge to the admission of his testimony in these

terms:

> Meadows . . . objected to the trial court's allowing Dr. Russell Compton to
> relate T.H.'s account of the sexual assault and the events leading up to it and to give
> his expert opinion that T.H.'s injuries were consistent with this account.
>
> Dr. Compton examined T.H. when she came in to the emergency room of
> University Hospital at approximately 2 p.m. on March 4, 2002, alleging that she has
> been sexually assaulted earlier. Dr. Compton testified that he first talked with T.H.
> to establish a rapport; then performed an external examination; and, finally,
> performed a sexual assault examination. He testified that T.H. had bruises in the
> following locations: over her left eyebrow and eyelid; left shoulder/chest area; right
> middle arm; left upper arm; right inner thigh; left outer thigh; and neck. Her neck
> had both linear bruises on one side and smaller bruises caused by significant
> pressure. She also had multiple abrasions on her right forearm and linear abrasions
> radiating out from her vagina.
>
> Dr. Compton also delivered an uninterrupted monologue lasting almost
> three-and-a-half minutes recounting everything that T.H. told him about the sexual

assault and the events leading up to it. KRE 803(4) sets forth a hearsay exception for "[s]tatements made for purposes of medical treatment or diagnosis and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis." Statements by T.H. concerning how she was struck, pinned down, choked, and forcibly penetrated are obviously relevant to describing the inception or cause of her injuries and relevant to treatment or diagnosis. And it was not error to admit Dr. Compton's retelling of these statements.

But Dr. Compton's testimony also included many hearsay statements which would not be admissible under KRE 803(4) because they were not made for the purpose of medical treatment. Such statements included, for example, Meadows's name, the bar where he and T.H. met, what they did at the bar, where they went after they left the bar, and what he said to her during the sexual assault. Notably, Meadows never objected to this testimony. In fact, on cross-examination, Meadows pursued this line of testimony by asking follow-up questions which would require additional answers based on inadmissible hearsay. Thus, this error is not preserved for judicial review. Even if we were to consider this error, we would deem the admission of this evidence to be harmless error. Meadows conceded that the impermissible hearsay testimony was cumulative of other evidence. And the admission of inadmissible hearsay testimony that is cumulative is harmless error.

*Meadows*, 178 S.W.3d at 537-38 (footnotes omitted).

As mentioned earlier, petitioner does not contend on appeal that the resolution of this evidentiary issue by the state courts entitles him to habeas relief. Rather, he argues that it is yet another instance of trial counsel's deficient performance. As the Kentucky Court of Appeals recognized, counsel failed to object to hearsay statements and permitted Dr. Compton to offer an "uninterrupted monologue." Counsel also failed to elicit that Dr. Compton was not present when the photographs of the victim's bruises were taken. Finally, petitioner also argues that trial counsel should have objected to Dr. Compton's testimony on the grounds that he was not on the Commonwealth's witness list.

Petitioner raised the issue of ineffective assistance of counsel in a motion for post-conviction

relief. The trial court declined to hold an evidentiary hearing and denied relief. The Court of

Appeals affirmed:

> The Appellant contends that his trial counsel failed to "meaningfully" refute the Commonwealth's expert witnesses. He argues that the expert hired to examine his wounds and testify as to how he had received them did not refute the testimony of the experts in the Commonwealth's case against him.
>
> Dr. Brad Smock examined the Appellant's penis and was not able to testify as to whether the bite was intentional. Foundation was properly laid and the trial court allowed Dr. Smock to testify as an expert regarding the cause of the wound. There is no indication that any other expert would have been able to ascertain whether the bite made by T.H. was intentional. Thus, trial counsel was not ineffective in using Dr. Smock as an expert nor in the examination of him during the trial.
>
> Next, Appellant argues that his counsel was ineffective in that he did not "generate" any "meaningful" investigation. Specifically, Appellant asserts that his counsel did not interview multiple individuals who were working at a Meijer's store who observed himself and T.H. on the evening in question. According to Appellant, the two of them were seen by these employees kissing, hugging, and in various stages of displaying affection. None of these witnesses, however, were in the Appellant's sister's home the night of the incident. Given the distance in time of the employees allegedly observing the Appellant and T.H., as well as the fact that none of them witnessed any events later in the evening when the assault occurred, this Court finds that there is no indication the investigation into these alleged witnesses would have changed the outcome of the Appellant's trial.
>
> In a similar vein, Appellant asserts that his trial counsel was ineffective by failing to interview school personnel at the school where T.H. phoned emergency services. T.H. was taken to a hospital emergency room for examination after her stop at the school. Evidence of the examination was presented to the jury at trial. "The burden of proof [is] upon the appellant to show that he was not adequately represented by appointed counsel." *Osborne v. Commonwealth*, 992 S.W.2d 860, 863 (Ky. App. 1998), citing *Jordan v. Commonwealth*, 445 S.W.2d 878, 879 (Ky. 1969).

> The Appellant has not shown any evidence which the school personnel may have given that would indicate the outcome of his trial would have been different. Consequently, his appeal fails on all issues which he has raised.

*Meadows v. Commonwealth*, 2008 WL 466115 (Ky. App. Feb. 22, 2008) at *2-3.

In *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the Supreme Court delineated the now-familiar contours of a claim of ineffective assistance of counsel. To prevail on such a claim, petitioner must first demonstrate that his counsel's performance was so deficient that it "fell below an objective standard of reasonableness" to the extent that "counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id*. at 687-88. Second, petitioner must show that this deficient performance prejudiced him, which in turn requires a showing that but for the deficient performance a substantial likelihood exists that the result of the trial would have been different. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011). As the Supreme Court recently pointed out, our review of a state court's decision with respect to ineffective assistance is "doubly deferential" because we take a "highly deferential" look at counsel's performance through the "deferential lens of § 2254(d)." *Id.* (quoting cases).

The high level of deference that we accord to counsel's performance under *Strickland*, coupled with the deference that we accord to the state court decision under AEDPA, govern the outcome. The defense theory at trial was that the sexual encounter between petitioner and T.H. was consensual. Petitioner made that argument to the jury through his testimony. Nevertheless, the jury chose to believe the victim. In addition, neither of the doctors who testified gave overly prejudicial testimony: Dr. Smock did not offer an opinion about whether the bite was intentional and Dr. Compton declined to speculate about when the bruises occurred. While both undoubtedly offered

testimony consistent with the Commonwealth's case, they did not speculate about matters unsupported by the evidence, such as whether the bite was intentional or the age of the bruises.

While trial counsel could undeniably have been more vigilant in objecting to statements made by Dr. Compton and could have done a more thorough investigation of witnesses prior to trial, our review of the trial in its entirety convinces us that these shortcomings were not "so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Moreover, as the Kentucky Court of Appeals recognized, even if counsel's performance was less than perfect, petitioner has not made a showing that the alleged errors prejudiced his defense.

## III.

The judgment is **affirmed**.